**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FRANCIS R. LAGACE,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of the Social
Security Administration.

      Defendant.

No. 19-cv-12421-DLC

**ORDER ON PLAINTIFF FRANCIS LAGACE'S MOTION TO REVERSE**
**AND COMMISSIONER'S MOTION TO AFFIRM**

DONALD L. CABELL, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Francis Lagace ("the plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his claim for disability insurance benefits ("DIB") based on mental and physical impairments. The plaintiff moves to reverse the Commissioner's decision and remand the matter for further consideration; the Commissioner in turn moves to affirm. (D. 14, 18). At issue is whether the Administrative Law Judge ("ALJ") failed to properly consider certain pieces of evidence bearing on the plaintiff's residual functional capacity

to work.  Discerning no error, the court will <u>deny</u> the plaintiff's motion to reverse and <u>allow</u> the Commissioner's motion to affirm.

II.   **PROCEDURAL HISTORY**

The plaintiff applied for DIB on November 22, 2017, alleging a disability beginning on July 6, 2016.  (D. 9, Social Security Administration ("SSA") Administrative Record of Social Security Proceedings (R. 331-32, 431)).   The SSA denied the application once on April 19, 2018, and then again on August 16, 2018, following a request for reconsideration.  (R. 265-68, 270-73).   On July 31, 2019, an ALJ found, following an administrative hearing, that the plaintiff was not disabled.  (R. 23).   On November 12, 2019, an Appeals Council denied the plaintiff's request for review, making that decision the Commissioner's final decision for purposes of this matter, which the plaintiff timely initiated on November 26, 2019.  (R. 1-7; D. 1).

III.  **FACTS**

A.  **Plaintiff's Personal and Employment Background**

The plaintiff was 54 years of age at the time of his date last insured, that is, December 31, 2017.  He attended four or more years of college.  He worked as a project representative/clerk in the construction setting, a job considered a skilled position requiring prolonged sitting, standing, and walking.  (R. 245, 347-348).  He alleged a disability beginning July 6, 2016, as a result of severe

2

anxiety, post-traumatic stress disorder ("PTSD"), depression, and chronic lower back pain related to lumbar degenerative disc disease. (R. 431).

## B. **Relevant Medical Evidence**

### 1. *Mental Health-Related Evidence*

Prior to his date last insured (December 31, 2017), the plaintiff received outpatient mental health treatment at the Massachusetts General Hospital ("MGH"), principally from Psychologist Dr. Timothy Petersen and Psychiatrist Dr. John Matthews, who had treated the plaintiff since 2014.

At a July 25, 2016 visit, the plaintiff's mood was noted to be stable overall, and his "interest, energy, appetite, sleep, concentration, and motivation good." (R. 455). He reported that he was tolerating his medications and experiencing no panic attacks, although he did have increased anxiety over finances. (Id.).

Dr. Petersen's notes indicate that the plaintiff throughout August 2016 was experiencing stress in connection with his personal life. His prescriptions for depression and anxiety included Wellbutrin, Klonopin, and Cymbalta; his prescriptions for pain included Neurontin, Robaxin, and Relafen. (R. 458, 485, 489).

Dr. Matthews reported following a September 14, 2016 visit that the plaintiff told of a "fluctuating depressed mood that tends to worsen when he is judged or criticized by friends and family,"

3

but noted that the plaintiff was "not experiencing persistent depressed mood or persistent loss of interest," and was "able to enjoy his hobbies." (R. 462). Dr. Matthews noted after a visit on September 19, 2016 that the plaintiff had used alcohol excessively over the years "to help his anxiety," but noted also that the plaintiff's functional history showed independence in self-care, albeit with "some decrease in IADLs (instrumental activities of daily living) and recreational activities secondary to pain." (R. 465) (definition added).

On October 3, 2016, Drs. Matthews and Petersen submitted a letter stating that the plaintiff suffers from "chronic symptoms consistent with the diagnoses of Major Depressive Disorder, Panic Disorder without Agoraphobia, and Generalized Anxiety Disorder," and suffered daily symptoms that included depression, anxiety, and irritability related conditions. (R. 437). They assessed that the plaintiff's symptoms left him unable to "effectively negotiate interpersonal relationships," prevented him from "sustaining focus on any activity for more than a short period of time," and "prevent[ed] him from being gainfully employed." (Id.).

The plaintiff continued to see Dr. Matthews from the fall of 2016 through the spring of 2017. His notes indicate that the plaintiff suffered increased anxiety and stress due to financial problems and intermittent depression, although his medications

were controlling his condition.   (R. 468-69, 473, 475, 477, 478, 480).

At visits in April, May, and June 2017, the plaintiff reported poor finances and family-related stress as contributing to a worsening of his depression.  (R. 477-80).

During the summer and into the fall of 2017, Dr. Matthews' notes reflect that the plaintiff was experiencing stress related to the death of his mother but was "functioning in spite of the stress" with a "fluctuating depressed mood." (R. 481).   The plaintiff experienced "some decreased concentration, decreased interest, interrupted sleep," but continued to tolerate his medications. (R. 482).

Dr. Petersen's notes from an August 21, 2017 evaluation similarly reflected that the plaintiff was experiencing a significant amount of anger, irritability, and confusion about his career direction.  (R. 518).

In addition to treatment by Drs. Matthews and Petersen, the plaintiff visited MGH and Morton Hospital during 2016 and 2017 for unrelated physical ailments, during which observations bearing on his mental state were made.  During one such visit in August 2016, his state was described as "mood and affect appropriate," (R. 456), and in the next visit "alert and oriented, no acute distress or anxieties today," (R. 459).  Morton Hospital notes describe him on July 30, 2017 as having a "calm, normal affect," (R. 439).  Mental

status exams performed at MGH's Bulfinch Program in late summer
2017 indicated cooperative behavior, normal speech and language,
even or angry mood, congruent affect, logical thought process,
"appropriate to situation" thought content, no suicidal
ideation/self-harm, no hallucinations, no deficits in memory,
intact attention, and above average intelligence. (R. 528-29,
538-39, 546-47). The plaintiff also did not experience significant
side effects from his medications during this time period. (R.
517).

The plaintiff also received treatment from Debora Lynn,
Ph.D., LICSW, of Changing Directions Counseling, beginning in the
fall of 2017. Her notes indicated that the plaintiff continued to
be diagnosed with "major depressive disorder, recurrent, mild" and
"panic disorder [episodic, paroxysmal anxiety]." (R. 600). During
December 2017, Dr. Lynn noted that the plaintiff's response to his
treatment plan was good and that his medication was effective.
(R. 608, 611, 613).

With respect to treatment after his date last insured, the
plaintiff saw Dr. Matthews again in 2018. His notes from a May
16, 2018 appointment indicate that the plaintiff had since his
last visit suffered "a significant relapse of depression with
persistent depressed mood, decreased interest, decreased energy,
decreased appetite, hypersomnia, decreased motivation." (R. 647).
Dr. Matthews noted further that the plaintiff's back pain had

worsened "[s]ince he has become depressed and off Effexor." (Id.)
The plaintiff continued to see Dr. Matthews through the summer and
fall of 2018 and followed a course of medications and Repetitive
Transcranial magnetic stimulation ("rTMS"). (R. 853-82).

At a December 4, 2018 visit with Dr. Matthews, the plaintiff
and his wife agreed that his depressive condition had improved
some since he began taking Luvox, allowing him to do more around
the house and engage in activities. (R. 853).

During a visit the following month on January 8, 2019, the
plaintiff reported that he had been feeling "a little apathetic,"
but that he continued to pursue his interest in real estate. (R.
843). He was tolerating his medications but reported some memory
problems after 9 treatments of rTMS. (Id.). The plaintiff also
reported an increase in back pain which he associated with an
increase in his depression. (Id.).

In April 2019, the plaintiff attempted to participate in a
partial hospitalization program for psychiatric care at Arbour-
Fuller Hospital but was unable to follow through. (R. 732-44).

Dr. Matthews noted that on April 11, 2019 the plaintiff was
"functioning well." (R. 803). He noted also that the plaintiff
had been tapering off Luvox without a worsening of depression, and
he recommended that the plaintiff reduce the dose and discontinue
it after two weeks. (Id.) The plaintiff reported intermittent
panic attacks but also reported that Wellbutrin was helping his

anxiety, and that he was not experiencing any delusions or
hallucinations, suicidal thoughts, plans or intent, or any day-
time sedation, dizziness or light-headedness.  (Id.).

### 2. Physical Health-Related Evidence

The plaintiff received physical health-related treatment both
before and after the date last insured.  On September 1, 2016, he
saw Dr. George Cohen for a rheumatology consultation concerning
pain in his right elbow and low back pain.  (R. 490).  An MRI
showed "severe degenerative changes at L3 floor and a disc
herniation which cause compression of the descending left L4 nerve
root."  (Id.).  The plaintiff reported that he could trace his
middle and lower back pain to an injury that occurred while working
in construction thirty years ago.  (R. 464).  He reported that the
pain, which he controlled with medication, was worse with standing
and activity, but did not radiate to his extremities, and he denied
weakness, numbness or bowel or bladder symptoms.  (Id.).  His
neurological findings were "alert and appropriate," and his gait
and station "within normal limits."  (R. 466).

On September 19, 2016, Drs. Michael Zaccagnino and Gary
Polykoff assessed the plaintiff as having "longstanding, chronic
right greater than left mid and low back pain with LE (lower
extremity) radiation . . . consistent with thoracolumbar likely
facet arthropathy and myofascial pain and radiculitis."  (R. 467).
They noted also that his persistent pain was "in significant

remission" with procedures that had been performed and medications. (Id.).

The plaintiff's station and gait appeared "normal" as of August and September 2017. (R. 528, 546). MGH progress notes from October 2017 and November 2017 indicate that the plaintiff was "ambulating without difficulty." (R. 501, 470).

With respect to treatment received after the date last insured, MGH records from March 2018 indicate that the plaintiff's pain had been controlled well until he discontinued Nabumetone. (R. 619). His gait and station were within normal limits. (R. 622).

On April 9, 2018, the plaintiff underwent an RFL (Radiofrequency lesioning) procedure at the MGH Center for Pain Medicine. Notes indicate that his presentation was "most consistent with thoracolumbar likely facet arthropathy and myofascial pain." (R. 636). In May 2018 the plaintiff reported that he had some pain relief for a few weeks after the procedure but that "overall it did not work." (R. 642). By December 2018, the plaintiff described his pain as "sharp and burning," rated it 8/10 at its worst, and 5/10 at its best, and complained that "nothing and anything" makes the pain worse. (R. 844).

On March 14, 2019, the plaintiff had an MRI procedure done on his lumbar spine. It showed "multilevel degenerative changes of the lumbar spine most pronounced at the L3-L4 where a disc

protrusion contacts the descending left L4 nerve root and compresses the extraforaminal left L3 nerve root." These findings were not significantly changed when compared to a prior MRI the plaintiff had undergone four years earlier in January 2015. (R. 818).

The plaintiff sought treatment later the same month at the MGH Center for Pain Medicine for chronic axial lower back pain. (R. 809). He described his pain as sharp and burning with numbness at the bottom of his feet and episodes of lower back spasms. (Id.). On March 28, 2019, the plaintiff received a lumbar epidural steroid injection at L5/S1. (R. 806). At his follow-up appointment, he reported continued pain in the low back area and posterior thigh. (R. 800).

### 3. Medical Opinion Evidence of Non-Examining Doctors

On February 16, 2018, Nancy Keuthen, Ph.D., an advising psychologist to the Disability Determination Service, evaluated the plaintiff's records to determine whether he had any medical impairments. She determined that his primary impairment was a severe discogenic and degenerative back disorder, with a secondary impairment of a severe depressive, bipolar and related disorder, and a third of a severe anxiety and obsessive-compulsive disorder. (R. 219). Dr. Keuthen determined that the plaintiff had moderate limitation in his ability to: sustain concentration and persistence; maintain attention and concentration for extended

10

periods; work in coordination with or in proximity to others without being distracted; complete a normal workday and workweek without interruptions; interact appropriately with the general public; accept instructions and respond appropriately to criticism; get along with coworkers; and adapt. (R. 222). Dr. Keuthen determined from her evaluation that the plaintiff could manage predictable job routines. (R. 224).

On July 3, 2018, Dr. Brian Stahl, an advising psychologist to the Disability Determination Service, conducted a similar assessment and determined that the plaintiff had mild limitation in understanding, remembering, or applying information, and that his abilities to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage oneself had moderate limitations. (R. 235). Dr. Stahl's evaluation supported depression and anxiety, but he noted that the conditions, while severe, did not meet or equal a listing. (Id.) Dr. Stahl concluded that the plaintiff was "able to work with coworkers and supervisors but not with the public," and "[h]e would do better in employment with limited interactions." (R. 241).

On March 28, 2018, Dr. Alice Truong, an advising physician to the Disability Determination Service, reviewed the plaintiff's record to assess his physical residual functional capacity ("RFC"). She opined that the plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand, walk or sit

about six hours in an eight-hour workday with normal breaks, could occasionally balance, stoop, kneel, crouch, crawl, or climb stairs or ramps, but could never climb ladders, ropes or scaffolds. (R. 221-22). Dr. Truong determined that the plaintiff could perform three specific occupations for which there were a significant number of jobs in the national economy, including winder, electronic worker, and encapsulator. (R. 225-26).

On June 28, 2018, Dr. Joseph Kahn, also an advising physician to the Disability Determination Service, made the same findings with respect to physical capacity and concluded that the plaintiff had the RFC to perform light work with some postural limitations. (R. 236-39).

C. **The Administrative Hearing**

The ALJ convened an administrative hearing on July 17, 2019. The plaintiff testified at the hearing and the ALJ also took testimony from an impartial vocational expert. (R. 11).

*1. The Plaintiff's Testimony*

The plaintiff testified regarding both his physical and mental health related ailments. Regarding his physical issues, he testified that he suffered from chronic back pain, radiating lower extremity pain, abdominal pain, appetite disturbance, and limited mobility. (R. 150-51, 153, 159, 170). He said that his physical impairments prevent him from lifting more than a small amount of weight and that he was unable to sit, stand, or walk for any

prolonged period.   (R. 159-60).   He also testified that the medications he was taking for his back pain caused him fatigue necessitating daytime naps.  (R. 160, 163).

With respect to mental impairments, the plaintiff testified that he felt anxiety, had recurrent recollections of past trauma, suffered from a low mood and lack of energy, and had poor concentration and comprehension.   (R. 164-65, 172-74).  As to daily functioning, the plaintiff testified that he prepared simple meals and jet-skied once a month, which helped his mental health, but suffered from irritability and had difficulty being around others.  (R. 150, 167-70).

### 2. The Vocational Expert

A vocational expert ("VE") testified and responded to a series of three hypotheticals posed by the ALJ.

First, the ALJ asked the VE if a hypothetical person of the same age, education, and work experience as the plaintiff, performing only up to the light level, with additional limitations on ramps and stairs, who is limited to simple, routine, repetitive tasks, and could tolerate only occasional workplace changes and occasional interaction with the public, supervisors, or coworkers (working primarily with things and not people), could perform his past work.  (R. 176).  The VE testified that the individual would be unable to return to the past relevant work but would be able to perform other unskilled light work that involved working with data

or things such as a small product assembler, a packer and sorter, and a production labeler.  (R. 176-77).

The ALJ then asked if the same hypothetical person would be able to perform any jobs in the national economy assuming he required unscheduled breaks or would be so inattentive to work duties such that he would be off-task up to one-third of the workday.  (R. 177).  The VE testified that he would not be able to sustain simple, routine, repetitive tasks.  (Id.).

Finally, the ALJ asked if the same hypothetical person could maintain any competitive employment assuming he was expected to be absent two or more days per month consistently.  (Id.).  The VE testified that two or more days would be an excessive amount of absenteeism unlikely to be tolerated.  (Id.).

## IV.   THE ALJ'S FINDINGS

On July 31, 2019, the ALJ found that the plaintiff was not disabled after following the SSA's mandated five-step sequential review process.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

Step one considers whether the claimant is engaged in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled.  20 C.F.R. § 404.1520(b).  The ALJ found that the plaintiff was not engaged in SGA from the alleged onset date[1] through his date last insured of December 31, 2017.  (R. 13).

---

[1] The ALJ states the onset date to be July 25, 2017, (R. 13, 23), but otherwise treats July 6, 2016, the date alleged by the plaintiff, as the onset date.  This minor discrepancy did not affect or impact the ALJ's

Step two considers whether the claimant has a medically determinable impairment (or combination of impairments) that is severe as defined by the pertinent regulations.  20 C.F.R. § 404.1520(c).  A claimant who does not have an impairment that is severe is not disabled.  The ALJ found that the plaintiff did have a severe impairment based on the combination of his low back pain secondary to disc degeneration at L3-L4; anxiety disorder; depressive disorder; and PTSD.  (R. 13).

Step three considers whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526); 20 C.F.R. §§ 416.920(d), 416.925, and 416.926.  If so, the claimant is conclusively presumed to be disabled.  Id.  If not, one moves on to step four.  Here, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments and accordingly went on to step four.  (R. 13).

Step four considers the claimant's RFC to work.  This step entails a two-part inquiry.  The ALJ first determines the claimant's RFC to work at all, that is, his ability to do physical and mental work activities on a sustained basis despite limitations

---

considerations and similarly does not affect the merits of any issue presently before the court.

from his impairments.  20 C.F.R. § 416.920(e).  The ALJ then determines whether the claimant has the RFC to perform the requirements of his past relevant work.  20 C.F.R. § 416.920(f). If the claimant has the RFC to do his past relevant work, he is not disabled.  Id.  However, if the claimant is not able to do any past relevant work, the analysis proceeds to the fifth and last step, which entails asking whether, with respect to the work the claimant can perform, there are jobs in the national economy that the claimant is capable of performing.

The ALJ found here that the plaintiff lacked the ability to do his past relevant work but did have the capacity to perform light work with some limitations.  Specifically, the ALJ found that:

> through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. [§] 404.1567(b) except that he could occasionally balance, stoop, knee, crouch, crawl, or climb stairs or ramps. [He] could never climb ladders, ropes, or scaffolds. [He] should avoid concentrated exposure to workplace hazards. [He] could perform simple, routine, and repetitive tasks. [He] could tolerate no more than occasional interaction with the general public, supervisors, or coworkers.  (R. 15-16).

Proceeding then to step five, the ALJ found that the plaintiff was able to perform work as a small product assembler, packer/sorter, or production labeler, occupations for which a significant number of positions existed in the national economy.

The ALJ accordingly found that the plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date last insured (December 31, 2017). (R. 22-23).

## V.   <u>STANDARD OF REVIEW</u>

A court reviews the findings of the Commissioner only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied. *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015). Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* (quoting *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). This court must keep in mind when applying this standard of review that it is the role of the Commissioner, and not this court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). This court may affirm, modify, or reverse the Commissioner's decision, but reversal is only warranted if the Commissioner made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Soc. Sec.*, 114 Fed. App'x. 410, 411 (1st Cir. 2004). This court

therefore must affirm the Commissioner's determination if it is supported by substantial weight, even if the record could arguably support a different conclusion.  *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

## VI.   DISCUSSION

The plaintiff contends that the ALJ conducted a flawed RFC assessment because he failed in three meaningful ways to properly consider or credit the evidence regarding the severity of his mental and physical impairments.  The plaintiff seeks a remand for further proceedings.  The Commissioner argues that a remand is not warranted because the ALJ reached a determination that was supported by substantial evidence in the record.  (R. 21-22).  The court first summarizes the ALJ's RFC assessment and then discusses each of the plaintiff's three arguments claiming error.

### A. The ALJ's RFC Assessment

The ALJ considered two factors in assessing the plaintiff's RFC, (1) the plaintiff's claimed symptoms and the extent to which they were reasonably consistent with the medical and other evidence, and (2) the medical opinion evidence, including prior administrative medical findings.

#### 1. The Plaintiff's Symptoms

In considering the plaintiff's symptoms, the ALJ considered the evidence in the record, including the plaintiff's medical

records from July 2016 to July 2018.  The ALJ also considered the plaintiff's testimony from the ALJ hearing on July 17, 2019, at which the plaintiff claimed, among other things, that he could not lift more than a small amount of weight or engage in prolonged periods of sitting, standing or walking; needed to get up and walk around to alleviate increased pain after being seated too long; took daytime naps of three to four hours as a result of back pain medication that caused fatigue; sometimes felt disoriented, and could not perform even simple work tasks because of poor concentration and excessive sedation.  (R. 159-60, 163-65, 172-74).

The ALJ found after considering the evidence that the plaintiff's impairments could reasonably be expected to cause his symptoms he claimed, but not to the degree he claimed.  The ALJ based this finding on three grounds.

First, while the objective medical evidence confirmed the presence of some degree of physical and mental limitations, it did not substantiate the plaintiff's allegation of disabling impairments.

Regarding physical impairments, the ALJ noted that the plaintiff's treatment for his spinal impairment was limited and consisted primarily of prescription medication.  And while the plaintiff had undergone interventions via injection therapy (albeit after the date last insured), he had also noted good

control of his back pain with medications alone, (R. 21, 463, 467, 619, 636), and his examinations generally showed evidence of intact neurological findings, normal gait and station, (R. 21, 466, 470, 501, 528, 546, 622), and no positive straight leg raises. (R. 21).

Regarding mental impairments, the ALJ noted that the record reflected no evidence of psychiatric hospitalization, no episodes of decompensation, and no suicidal ideation during the relevant time period. (Id.). Rather, the record showed that the plaintiff was able to manage his symptoms with medication and therapy modalities, and typically had mental status examination findings within normal limits. (R. 21, 439, 443, 456, 459, 528-29, 538-39, 546-47). The ALJ acknowledged that the plaintiff's symptoms fluctuated at times of increased stress, but noted that he had also reported improvement or stability in his symptoms in the setting of treatment compliance, and did not require any more substantial forms of treatment, such as partial hospitalization or inpatient admissions, despite significant social stressors. (R. 21, 455, 458, 462, 468-69, 473, 508, 608, 611, 613).

Second, the record did not indicate that the plaintiff had made any persistent complaint of side effects from medication, or that his providers had seen a need to make any significant change in the type of medication he was taking. (R. 455, 473,

475, 477, 478, 480, 481, 482, 517 ("denies any significant side effects from his medications")).

Third, the ALJ noted that the plaintiff reported a range of daily activities that were not generally consistent with his allegations of disabling physical and mental impairments, including that he was able to attend to personal care tasks, (R. 465), prepare simple meals, (R. 150, 367), put away laundry, (R. 367), take out the trash, (R. 367), do minor household or yard tasks, (R. 238, 367), drive a car, (R. 238, 368), shop, (R. 368), use a computer, (R. 365, 368), spend time with his wife or a friend, (R. 369), and attend medical appointments (R. 22).

*2. The Medical Opinions and Prior Medical Findings*

With respect to the evidence regarding medical opinions and prior administrative medical findings, the ALJ considered the assessments of Drs. Truong and Kahn, who found that the plaintiff retained the physical capacity to perform light work and could occasionally lift 20 pounds, frequently lift 10 pounds, and stand, walk or sit up to six hours in an eight-hour workday with normal breaks. (R. 18, 221-22, 236-39). The ALJ found that their assessments were "persuasive" and "consistent with the record as whole." (R. 20).

With respect to the plaintiff's mental impairments, the ALJ considered the assessments of Drs. Keuthen and Stahl, who concluded that the plaintiff had moderate limitations but could

21

perform some work.  (R. 19-20, 222, 224, 235, 241).  The ALJ
also found their assessments to be persuasive and consistent
with the record as a whole.  (R. 21).

By contrast, the ALJ considered but found unpersuasive the
assessments of Drs. Petersen and Matthews, who in October 2016
opined that the plaintiff was not able to be gainfully employed
because he suffered from symptoms consistent with diagnoses of
Major Depressive Disorder, and Panic Disorder without
Agoraphobia, and was unable to effectively negotiate
interpersonal relationships or focus on any activity for more
than a short period of time.  (R. 21, 437).  The ALJ explained
that he discounted their opinion because the assessed degree of
limitation in their opinion was (1) inconsistent with the
plaintiff's "entirely conservative and generally effective
mental health treatment history," (2) inconsistent with the
plaintiff's "limited findings upon mental status examination
throughout the record," and (3) inconsistent with the
plaintiff's "reasonable range of reported daily activities."
(R. 21).

The ALJ also considered the supportive assessment of the
plaintiff's wife but found it to be unpersuasive because (1) she
was not "medically trained to make exacting observations," (2)
could not be considered a disinterested third party given her
relationship to the plaintiff, and (3) her opinion was not

22

consistent with the preponderance of the medical evidence of record in the case.  (R. 21, 434-35).

Based on the foregoing, the ALJ found that the plaintiff retained the RFC to perform some light work with limitations as noted above.

**B. The Plaintiff's Claims**

Against this backdrop, the plaintiff contends that the ALJ conducted a flawed RFC assessment because he (1) failed to consider evidence of the plaintiff's distractibility; (2) failed to properly assess the impact of his wife's testimony; and (3) failed to properly assess the plaintiff's own testimony.  The court, mindful that its inquiry is not whether the evidence could ever plausibly support a finding of disability, but rather whether the ALJ's findings were supported by the record and reflected a correct application of the law, finds no reversible error.  *See Evangelista*, 826 F.2d at 144.

*1. Evidence of Distractibility*

The ALJ found that the plaintiff could perform simple, routine, and repetitive tasks but, based on the assessments of State Agency examiners Drs. Keuthen and Stahl, whose opinions he found "persuasive" and "consistent with the record as a whole," found that he "could tolerate no more than occasional interaction with the general public, supervisors, or coworkers."  (R. 15-16, 21).  The plaintiff agrees with this limitation but argues that it

23

did not go far enough.  The plaintiff contends that the ALJ should
have also incorporated the doctors' statement that he "may be more
distractible if working in close proximity with others." (R. 223,
240).  The plaintiff contends that this statement suggested that
he might be distracted by the mere presence of others, even if he
was not working with them, suggesting a greater limitation on his
capacity than that suggested in the hypothetical the ALJ posed to
the vocational expert, which did ask about the plaintiff's ability
to work with others, but not about his ability to work in others'
presence.  The plaintiff argues that the ALJ thus conducted a
flawed RFC assessment because he failed as required when posing
hypotheticals to include a complete and accurate description of
the plaintiff's limitations.  *See e.g., Newton v. Charter*, 92 F.3d
688, 694-95 (8th Cir. 1996).  The plaintiff argues that a remand
is necessary to clarify whether the plaintiff truly would be able
to perform the occupations opined by the vocational expert.

The Commissioner responds that the two doctors' statement is
hardly unequivocal regarding distractibility, indicating only that
the plaintiff "may" rather than "will" be more distractible if
working in close proximity with others.  More to the point, the
Commissioner argues that, even assuming the doctors' statement
constituted a medical opinion warranting acknowledgment and
consideration, the ALJ's failure to discuss it was at most harmless
error because none of the jobs the vocational expert identified or

the ALJ relied upon in assessing the plaintiff's RFC -- small product assembler, packer/sorter and production labeler -- required the plaintiff to be in close contact with coworkers. Consequently, there is no fear that the ALJ's failure to incorporate the limitation in a hypothetical resulted in a flawed RFC assessment or caused the vocational expert to identify positions that the plaintiff could perform that he in fact could not perform.

The court agrees that any error here was harmless.  As an initial matter, the doctors, despite expressing a possibility of the plaintiff's being distracted if in close proximity to others, opined that he could work with others and was only "moderately limited" in his ability to respond appropriately to changes in the work setting.   (R. 223, 258).  Further, even if the doctors' statement on distractibility constituted a medical opinion warranting the ALJ's acknowledgment and assessment, the ALJ's first hypothetical arguably captured the spirit of the limitation where he asked the vocational expert to assess the functional capacity of someone who "could tolerate only occasional. . . interaction with. . . coworkers" and ideally would work "primarily with things and not people," (R. 176).  Although not stated in explicit terms, this hypothetical arguably encompassed as one of the limitations a possible concern that the plaintiff's capacity

to work could be adversely impacted merely by being in close proximity to others.

But even assuming it did not, and even assuming it ideally should have, any error was harmless because none of the three occupations the vocational expert identified required working in close proximity to others. *See Freddette v. Berryhill*, No. 17-CV-672 PB, 2019 WL 121249, at *7 (D.N.H. Jan. 7, 2019) (harmless error where alleged limitation regarding general interaction with coworkers was not included in ALJ's hypothetical but was not necessary to perform jobs identified by VE).

As the Commissioner notes, the expert testified that the plaintiff could perform the duties of small product assembler, packer/sorter, and productions labeler, all positions where according to the job codes the plaintiff would be working with things rather than people. (R. 23, 176) (small product assembler-SVP 2; Dictionary of Occupational Titles ("DOT") 712.687-010; packer and sorter-SVP 2, DOT 222.687-022; production labeler-SVP 2; DOT 920.687-126); *see Simpson v. Colvin*, No. 1:13-168 NAB, 2014 WL 5313724, at *21 (E.D. Mo. Oct. 16, 2014) (claim that ALJ's RFC determination did not account for "inability to work in close proximity" with others failed because jobs suggested by VE did not require significant contact with other people). More pertinently, each of the jobs identified by the DOT codes given by the VE (with variation in job titles) had a people rating of 8, indicating the

26

lowest level of human interaction in the range of occupations, and had a job description describing the level of interpersonal interaction as "not significant."[2]  *See* 1991 WL 679245, WL 672133, 1991 WL 687992.  As such, the occupations noted were not likely to require that the plaintiff work in close proximity to others.  *See Simpson*, 2014 WL 5313724, at * 21 ("It cannot be said therefore, that the ALJ's RFC limitation restricting plaintiff to only occasional contact with supervisors and co-workers in jobs involving Level 8 interaction as defined by the DOT would require plaintiff to work 'in close proximity' to such persons.").

In sum, it is arguable whether the ALJ in fact failed to accurately describe the plaintiff's limitations in posing hypotheticals to the vocational expert.  But assuming he did, any error was harmless where the ALJ identified jobs that the plaintiff could perform even if the suggested limitation on "close proximity" had been included.  There is thus no basis for a remand on this issue.  *See e.g., Bennett v. Berryhill*, 256 F. Supp. 3d 93, 98 (D. Mass. 2017) (remand not necessary where ALJ failed to discuss doctor's standing and walking limitations where they would not have prevented claimant from performing jobs identified by VE).

---

[2] The DOT rates the amount of interaction with people on a scale of 0-8; 8 represents the lowest level of human interaction in the labor force.  At this ranking, the individual takes instructions "[a]ttending to the work assignment instructions or orders of supervisor" with "[n]o immediate response required unless clarification of instructions or orders is needed." DOT, App. B-Explanation of Data, People, & Things, 1991 WL 688701.

## 2. The Plaintiff's Wife's Opinion Testimony

The plaintiff's wife submitted a written statement in support of his application.  She stated among other things that his mental impairments and medications caused him to sleep as many as 18 hours a day, stunted his social skills and gave rise to feelings of fear and shame, and caused him confusion and impacted his ability to follow directions.  (R. 434-35).  The ALJ considered the testimony but found it to be unpersuasive because the plaintiff's wife (1) was not "medically trained to make exacting observations," (2) could not be considered a disinterested third party given her relationship to the plaintiff, and (3) her opinion was not consistent with the preponderance of the medical evidence of record in the case.  (R. 21).

The plaintiff acknowledges that while an ALJ must consider testimony from lay witnesses such as friends or family, the ALJ may reject the testimony and need not provide express reasons for doing so.  See 20 C.F.R. §§ 404.1529(c)(3), 404.1545(a)(3); SSR 06-06-03p.  Notwithstanding this discretion, the plaintiff, characterizing the ALJ's discounting of the letter as no more than a "blanket dismissal" and "sweeping rejection" of "an important and credible lay witness," argues that the ALJ was required to offer more fulsome reasoning than he did in discounting her statements.  This argument does not go far in light of the record.

An ALJ's credibility determination will be upheld as long as the ALJ provides at least one legally sufficient reason for that determination.  *See Lopez v. Colvin,* No. 15-30200 KAR, 2017 WL 1217111, at *11 (D. Mass. Mar. 21, 2017).  Here, the ALJ offered three, including that the thrust of the letter did not square with the evidence in the record, the plaintiff's wife was not qualified to offer medically dispositive assessments regarding his condition, and her close relationship to the plaintiff gave rise to concerns of bias.  The court finds each of these reasons to be sound and/or supported by the record.  The ALJ thus did not err in his treatment of this testimony.

### 3. The Plaintiff's Symptoms Testimony

The ALJ found from the evidence in the record that the plaintiff's impairments could reasonably be expected to cause the symptoms the plaintiff complained of, but not to the degree he complained of in terms of their persistence and intensity.  The ALJ gave three reasons for this finding.

First, the ALJ explained that the objective medical evidence was not consistent with the plaintiff's allegations regarding his physical and mental impairments.  The plaintiff contends that this finding was flawed because there was some evidence supporting his allegations, including the records of Drs. Petersen and Lynn and others suggesting that his anxiety was indeed severe, and MRI studies documenting "compression of the lumbar nerve roots,"

29

findings which were "likely to result in the chronic pain" he described.

This argument fails, though, because even assuming *arguendo* that the plaintiff identified some pieces of evidence contrary to the ALJ's findings, that fact alone "does not extinguish the substantial evidence supporting the ALJ's findings." *Greene v. Astrue*, No. 11-CV-30084 KPN, 2012 WL 1248977, at *3 (D. Mass. April 12, 2012). Again, the issue is not whether there is some evidence in the record supporting the plaintiff's allegations –- there usually is -- but whether substantial evidence supported the ALJ's finding. *Evangelista*, 826 F.2d at 144.

It did here. Putting aside the pieces of evidence cited by the plaintiff, the record amply supports the ALJ's assessment that the plaintiff's allegations overstated the severity of his symptoms. With respect to mental impairments, the ALJ noted that the record reflected "no evidence of psychiatric hospitalization, episodes of decompensation, or suicidal ideation during the time period in question," and instead reflected the plaintiff's ability to manage his mental impairment symptoms "with a conservative regimen of treatment, such as medication and therapy modalities." (R. 21, 455, 458, 462, 508). In addition, Drs. Matthews and Lynn both noted that medications were effective at different times in controlling the plaintiff's anxiety, stress, and intermittent depression, (R. 468-69, 473, 477-80, 611, 613). Further, and as

the ALJ found, treatment records supported his finding that the plaintiff "exhibited only a mild-to-moderate degree of overall mental impairment" supported by mental status examinations "largely within normal limits." (R. 21, 439, 443, 456, 459, 528-29, 538-39, 546-47). More, the evidence showed an "improvement or stability in [the plaintiff's] symptoms" despite fluctuations during stressful times that have not required "any more substantial forms of treatment." (R. 21, 455, 458, 462, 468-69, 473, 508, 608, 611, 613).

Similarly with respect to physical impairments, the ALJ noted that records bearing on treatment for the plaintiff's spinal impairment were limited primarily to the efficacy of medication and indicated that it helped to control his back pain. (R. 21, 463, 467, 619, 636). The plaintiff did not progress to intervention by injections until after the date last insured, and medical records supported a finding of intact neurological findings, and normal gait and station. (R. 21, 466, 470, 501, 528, 546, 622, 636).

In sum, even crediting the evidence cited by the plaintiff, substantial evidence in the record supported the ALJ's judgment that the objective medical evidence was not consistent with the plaintiff's allegations regarding the severity of his physical and mental impairments.

Second, the ALJ noted that the record did not indicate that the plaintiff had made any persistent complaint of side effects from medication, or that medical providers had seen a need to make any significant changes in the type of medication.  (R. 22).  The plaintiff does not really dispute this observation but argues that it did not provide a basis to discount his testimony because it did not make his symptoms of "pain and mental distress" any "less real."

The court is sympathetic to the plaintiff's argument to the extent he argues that one might suffer serious pain and distress without necessarily complaining about the effect or effectiveness of medication.  Still, the court interprets the ALJ's finding here more as suggesting that the absence of such records suggests that the medications the plaintiff was taking were generally effective and/or well tolerated.  In that regard, the court finds no basis to challenge the ALJ's consideration of the evidence.  In evaluating a claimant's subjective symptoms, an ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication [he] take[s] or ha[s] taken to alleviate [his] pain or other symptoms."  20 C.F.R. § 404.1529(c)(3)(iv).  Here, there was evidence that the plaintiff did not feel significant side effects from his medication such as sedation, dizziness, or light-headedness.  (R. 455, 473, 475, 477, 478, 480, 481, 482, 517

("denies any significant side effects from his medications")).
The court thus did not err.

Finally, the ALJ found that the plaintiff's daily activities
were "generally [not] consistent with the allegations of
disability physical and mental impairments." (R. 22). An ALJ
must consider [a claimant's] daily activities," in evaluating
subjective symptoms. 20 C.F.R. § 404.1529(c)(3)(i). The ALJ
properly fulfilled this requirement. In the area of functioning,
the ALJ found that the plaintiff "[was] able to attend to personal
care tasks, (R. 465), prepare simple meals, (R. 150, 367), put
away laundry, (R. 367), take out the trash, (R. 367), do minor
household or yard tasks, (R. 238, 367) drive an automobile, (R.
238, 368), shop for items, (R. 368), use a computer, (R. 365, 368),
spend time with a friend/his wife, (R. 369), and attend his medical
appointments, (R. 369)." (R. 22).

The plaintiff argues that these findings, while correct, were
misleading because he at all times suffered from his mental and
physical impairments as he performed the activities, and in some
instances required assistance to perform some of them. The ALJ
addressed this response, however, and discounted it because (1)
the plaintiff's account of his limitations on his daily activities
could not be objectively verified, and (2) even if his daily
activities were as limited as alleged, the record as a whole did

not support attributing that degree of limitation to his medical condition.  (R. 22).

There is no basis to challenge the ALJ's assessment.  Even crediting that the plaintiff suffered through some of the activities cited by the ALJ, the ALJ still could rely upon the plaintiff's ability to do them in assessing the credibility of his subjective statements of his symptoms.  *Coskery v. Berryhill*, 892 F.3d 1, 7 (1st Cir. 2018) (even accepting claimant's contention that ability to engage in daily activities such as household chores and grocery shopping may not "necessarily demonstrate that [claimant] is able to perform 'light work,'" court found it was still "permissible" for ALJ to draw a contrary inference from the record); *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (ALJ could consider testimony of claimant's daily activities even though claimant also claimed to require assistance to complete them).  Here, the ALJ considered the plaintiff's reports of limitation in his daily activities but found them to be "outweighed by the other factors."  (R. 22).  That the plaintiff disagrees with the conclusion the ALJ reached is understandable, but it does not render that conclusion erroneous.

In sum, there is no basis to find that the ALJ improperly assessed the plaintiff's subjective symptoms.

## VII. <u>CONCLUSION</u>

For the foregoing reasons, the plaintiff's Motion to Reverse (D. 14) is <u>DENIED</u> and the Commissioner's Motion to Affirm (D. 18) is <u>ALLOWED</u>.

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, U.S.M.J.

DATED:  May 7, 2021